# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# FORT WAYNE DIVISION

| | |
|---|---|
| BRYAN K. HODGES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:09-CV-00216 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Bryan Hodges appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying his application under the Social Security Act (the "Act") for Disability Insurance Benefits ("DIB") for the period of October 13, 2000, to August 31, 2005.[1] (*See* Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.[2]

## I. PROCEDURAL HISTORY

Hodges applied for DIB on or about October 31, 2002, alleging that he became disabled as of October 13, 2000. (Tr. 12.) The Commissioner denied his application initially and upon reconsideration, and Hodges requested a hearing. (Tr. 26A, 28.) On November 10, 2004, Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing at which Hodges (who was represented by counsel), his landlady, and a vocational expert ("VE") testified. (Tr.

---

[1] The Commissioner has determined that Hodges was, in fact, disabled and entitled to DIB beginning September 1, 2005. (Tr. 344-45.)

[2] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

251-82.) The ALJ rendered an unfavorable decision to Hodges on February 18, 2005, concluding that he was not disabled despite the limitations caused by his impairments because he could perform a significant number of jobs in the economy. (Tr. 12-19.) The Appeals Council denied his request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 3-5.) Hodges then filed a complaint with this Court on October 3, 2005, seeking relief from the Commissioner's final decision. (*See Hodges v. Comm'r of Soc. Sec.*, No 1:05-cv-349, Docket # 1.) On May 14, 2007, the District Court reversed the Commissioner's decision and remanded the case to the Commissioner for further proceedings. (*See Hodges v. Comm'r of Soc. Sec.*, No 1:05-cv-349, Docket # 26, 27.)

While that appeal was pending, Hodges filed a second application for benefits with the Commissioner, alleging an amended disability onset date of September 1, 2005. (Tr. 345.) This time, the Commissioner rendered Hodges a favorable decision, determining that he was disabled as of that date. (Tr. 345.) As a result, the Appeals Council directed the ALJ to address upon remand only the period of October 13, 2000 (Hodges's original alleged onset date), through August 31, 2005. (Tr. 344-45.)

Accordingly, on November 2, 2007, the ALJ conducted a second hearing at which Hodges (who was again represented by counsel), his landlady, and a VE testified, focusing on the period of October 13, 2000, to August 31, 2005. (Tr. 415-36.) On May 19, 2008, the ALJ rendered an unfavorable decision to Hodges, concluding that he was not disabled during the relevant period despite the limitations caused by his impairments because he could perform a significant number of jobs in the economy. (Tr. 304-11.) The Appeals Council denied Hodges's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 283-

86.) Hodges then filed the instant action with this Court on August 6, 2009, seeking relief from the Commissioner's final decision with respect to the period of October 13, 2000, to August 31, 2005. (Docket # 1.)

## II. HODGES'S ARGUMENTS

Hodges alleges two flaws with the Commissioner's final decision. Specifically, Hodges claims that the ALJ (1) improperly discounted the credibility of his testimony of debilitating limitations; and (2) failed to give adequate consideration to the diagnosis of "chronic pain syndrome" assigned to him by Dr. Philip Johnson, his family practitioner. (Opening Br. 10-21.)

## III. FACTUAL BACKGROUND[3]

### A. Background

As of August 31, 2005, Hodges was forty-eight years old, had a high school education, and had completed a five-year electrical apprenticeship program, as well as two years of vocational training. (Tr. 28, 50, 419.) He had twenty-one years of work experience as a certified welder and electrician. (Tr. 45, 255.)

At the hearing, Hodges testified he left his job as an electrician in October 2000 after he had back surgery to remove two disks. (Tr. 419-21.) He stated that during the relevant period (October 13, 2000, through August 31, 2005), he could not work due to experiencing constant, stabbing, and shooting pain in his back and in both legs, explaining that "it hurt [him] just to breath[e]." (Tr. 421-23.) Hodges elaborated that the pain was in his middle to lower back, extending down his left leg to his toes and down his right leg to his foot. (Tr. 422.) He stated that unless he "move[s] around" or "sit[s] a certain way", the pain is "almost unbearable" and

---

[3] In the interest of brevity, this opinion recounts only the portions of the 436-page administrative record necessary to the decision.

can make him nauseous at times. (Tr. 422.) He described the pain as a "six" or "seven" on a ten-point scale, even when taking medications. (Tr. 423-24.) He elaborated that he could walk, but that he frequently has to take breaks and sit down. (Tr. 422.) He took a variety of pain medications at the time, which disrupted his sleep and caused him to feel depressed, nauseous, and constipated. (Tr. 422, 424.)

When asked to describe his typical day, Hodges testified that he gets up between 11:00 a.m. and 1:00 p.m., eats breakfast, and then lies on the couch and watches television. (Tr. 425.) He takes his medications, which often cause him to nap. (Tr. 425.) When his landlady gets home from work, he will talk with her, and she sometimes helps him to take a shower. (Tr. 425, 427.) She then prepares a meal for him, and he watches television until 2:30 a.m. (Tr. 426.) Hodges reported that during the relevant period he needed help with dressing and getting in and out of the shower, and stated that he did not drive a car, shop, or perform housework. (Tr. 427-28.)

As to his physical capacity, Hodges reported that during the relevant period he could sit for ten to fifteen minutes at a time, stand for five to ten minutes, walk thirty to forty steps, and lift ten to fifteen pounds. (Tr. 426-27.) He explained that standing and lying down sometimes helped to reduce his pain. (Tr. 426.) He elaborated that he could not stoop, kneel, crouch, crawl, or climb stairs.[4] (Tr. 429.)

### B. *Summary of the Relevant Medical Evidence*

After injuring his back at work in May 2000, Hodges experienced "significant back, buttock, and leg pain." (Tr. 44, 114.) Physical therapy and epidural injections did not relieve the

---

[4] Hodges's landlady also testified at the hearing, essentially corroborating Hodges's testimony about his daily activities. (Tr. 431-32.)

4

pain, and an MRI revealed a central disk herniation at the L5-S1 level. (Tr. 114.) On examination in September 2000, Hodges exhibited limited range of motion, a positive straight leg raising test at about sixty degrees on the left, mild ankle plantar flexor weakness, and some hypesthesias in the lateral foot; his reflexes, however, were normal. (Tr. 114.) Dr. Alan McGee, an orthopaedic surgeon, diagnosed an SI radiculopathy due to a symptomatic extruded disk fragment underneath the S1 root, and he performed a lumbar discectomy on Hodges in November. (Tr. 111-12, 114.)

Although he obtained some initial relief from the surgery, Hodges's pain returned. (Tr. 103-10.) In January 2001, Dr. McGee referred him to Dr. Patrick Boylan, a physical medicine and rehabilitation specialist, and he administered an epidural injection. (Tr. 103-10.) When Hodges's pain continued to worsen, Dr. McGee obtained another MRI, but it revealed no definite etiology for his symptoms. (Tr. 101-02.)

In February 2001, Dr. Boylan noted that Hodges continued to complain of pain. (Tr. 96-98.) Upon examination, Hodges's gait was not antalgic, and he was able to walk on heels and toes, though he appeared to have some weakness when walking on his toes. (Tr. 96-98.) Hodges's ankle reflexes were asymmetrical, and his sensation in his lateral left foot was diminished. (Tr. 96-98.) Flexion and extension of the spine increased his pain. (Tr. 96-98.) Noting that his home exercise program was incomplete, Dr. Boylan referred Hodges for physical therapy and restricted him to lift no more than ten pounds frequently and twenty-five pounds occasionally, with only occasional twisting and bending, and no climbing. (Tr. 98.) Dr. Boylan then reiterated these restrictions the following month. (Tr. 94.)

In April 2001, Hodges reported mild improvement in his symptoms, though he still

5

complained of residual radiculopathy. (Tr. 93.) Dr. Boylan reduced his work restrictions to lifting no more than twenty-five pounds frequently and forty-five pounds occasionally, with only occasional twisting or bending. (Tr. 93.) Dr. Boylan administered a second epidural injection in May 2001. (Tr. 90-91.) In June, Dr. Boylan referred Hodges for a functional capacity evaluation ("FCE"), the results of which were considered valid and limited him to lifting and carrying twenty to twenty-five pounds occasionally, ten to twelve and one-half pounds frequently, and four to five pounds constantly. (Tr. 88-89.) It further indicated that Hodges could perform sitting and standing duties frequently, and kneeling and squatting duties occasionally. (Tr. 88.) Dr. Boylan awarded a worker's compensation permanent partial impairment rating of thirteen percent. (Tr. 88.)

In July 2001, Dr. Philip Johnson, a family practitioner, assumed Hodges's pain management, initially diagnosing him with "low back syndrome" and prescribing Vicodin. (Tr. 168.) He examined Hodges and concluded that he had the following permanent work restrictions: no significant limitations to sitting; stand for no more than thirty minutes; walk for no more than sixty feet; lift twenty pounds only several times in a row; significant limitations in pushing or pulling due to pain; unable to bend, squat, or touch the floor; moderate to severe limitations in crawling; and climb one flight of stairs but never ladders. (Tr. 170.) Hodges saw Dr. Johnson on a monthly basis through March 2003 for check-ups and pain control, and he eventually diagnosed him with "chronic pain syndrome". (Tr. 124-70.) In May 2002, Dr. Johnson discontinued Hodges's Vicodin and started him on Methadone and Neurontin. (Tr. 139, 151.)

On January 17, 2003, Dr. Venkata Kancherla examined Hodges at the request of the state

6

agency. (Tr. 118-20.) Dr. Kancherla observed that Hodges walked slowly and appeared uncomfortable while standing or sitting; he was, however, able to dress and undress himself, get on and off the examination table, recline flat, sit up, walk on heels and toes, and squat. (Tr. 119.) Neurological testing was normal except for impaired sensation over the L5-S1 dermatomes on the lateral margin of the left foot and lateral compartment of the left leg. (Tr. 119.) Muscle strength and gait were normal, there was no wasting or atrophy, and station was erect. (Tr. 119.) Dr. Kancherla concluded that Hodges's only significant physical findings were the impaired sensation, a scar over the lumbosacral spine, and positive straight leg raising tests at forty degrees on the left and eighty degrees on the right. (Tr. 119-20.)

Dr. A. Lopez, a state agency physician, reviewed Hodges's record and opined that he could lift twenty pounds occasionally and ten pounds frequently; and stand, walk, or sit for about six hours each during an eight-hour workday. (Tr. 185-92.) Dr. Lopez also indicated that Hodges could occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 185-92.)

On February 11, 2003, F. Kladder, Ph.D., a state agency psychologist, reviewed Hodges's record and concluded that he did not have a severe mental impairment. (Tr. 171.) His opinion was later affirmed by a second state agency psychologist. (Tr. 171.)

In February 2003, Dr. Johnson discontinued Hodges's Methadone and restarted him on Ultra, Vicodin, and Elavil. (Tr. 209.) The next month, Dr. Johnson opined that Hodges had significant limitations in his ability to walk, lift, squat, crawl, climb, and reach above his shoulders; and moderate limitations in his ability to sit, stand, push or pull, bend, drive, engage in repetitive leg movements, and do normal housework. (Tr. 414.) In October 2003, Dr. Johnson wrote that Hodges was "unable to work due to his many medical problems," which he

7

characterized as "life long". (Tr. 199.)

In June 2004, Dr. Johnson indicated that Hodges could lift less than ten pounds, stand or walk for less than two hours in an eight-hour day, and sit for less than two hours in an eight-hour day. (Tr. 231-34.) He further opined that Hodges could sit for fifteen minutes or stand for twenty minutes before he needed to change position. (Tr. 231-34.) He stated that Hodges needed to "walk around" for ten minutes every fifteen minutes and to alternate between sitting and standing at will. (Tr. 231-34.) Hodges would not, however, need to lie down at unpredictable intervals during a work shift. (Tr. 231-34.) Dr. Johnson further opined that Hodges could never twist, stoop, crouch, climb stairs or ladders; and that his ability to reach, handle, feel, and push or pull were impacted by his pain. (Tr. 231-34.) He also assigned Hodges certain environmental limitations and stated summarily that he "can't work . . . without pain". (Tr. 231-34.) The next month, Dr. Johnson essentially affirmed these limitations in a letter. (Tr. 196.)

In October 2007, Dr. Johnson penned another letter addressed "To Whom it May Concern," stating that his June 2004 statement that Hodges "can't work" was accurate, but that if he indeed were working, he would miss more than three days per month due to his continuous pain. (Tr. 409.)

## IV. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

8

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## V. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if he establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's

impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On May 19, 2008, the ALJ rendered his decision concerning the period of October 13, 2000, to August 31, 2005. (Tr. 304-11.) He found at step one of the five-step analysis that Hodges had not engaged in substantial gainful activity during the relevant period. (Tr. 306.) At step two, he concluded that Hodges's lumbar degenerative disk disease was a severe impairment. (Tr. 306.) The ALJ then at step three determined that his impairment or combination of impairments was not severe enough to meet a listing. (Tr. 307.)

Before proceeding to step four, the ALJ assigned Hodges the following RFC for the relevant period and found that his subjective complaints were "not credible to the extent they are inconsistent" with such RFC:

[T]he claimant has the [RFC] to perform light work . . . except the claimant is

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

10

> restricted from climbing ladders, ropes, and scaffolds; is restricted from work
> around unprotected heights; and is limited to infrequent and not repetitive
> crawling, crouching, kneeling, and stooping. The undersigned further finds the
> claimant can perform simple, routine, and repetitive tasks.

(Tr. 307.) Based on this RFC and the VE's testimony, the ALJ concluded at step four that Hodges was incapable of performing his past relevant work as an electrician. (Tr. 310.) The ALJ concluded at step five, however, that he could perform a significant number of other jobs within the economy, including small parts assembler, small products assembler, and sub-assembler. (Tr. 310.) Therefore, Hodges's claim for DIB was denied. (Tr. 311.)

### C. *The ALJ's Credibility Determination Will Not Be Disturbed*

Hodges first contends that the ALJ improperly discounted the credibility of his testimony of debilitating limitations. The ALJ's credibility determination, however, will not be disturbed.

"Credibility determinations are the second step in a two-step process prescribed by the regulations for evaluating a claimant's request for disability benefits based on pain." *Aidinovski v. Apfel*, 27 F. Supp. 2d 1097, 1103 (N.D. Ill. 1998) (citations omitted); *see* 20 C.F.R. § 404.1529; *Behymer v. Apfel*, 45 F. Supp. 2d 654, 662 (N.D. Ind. 1999); SSR 96-7p. First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment (that is, an impairment that can be shown by medically acceptable clinical and laboratory diagnostic techniques) that could reasonably be expected to produce the claimant's pain or other symptoms. 20 C.F.R. § 404.1529; *Williams v. Chater*, 915 F. Supp. 954, 964 (N.D. Ind. 1996); SSR 96-7p. If the record does not allow the ALJ to make such a finding, then that ends the inquiry, for a finding of disability cannot be made solely on the basis of the claimant's symptoms, even if they appear genuine. SSR 96-7p.

If, however, the medical evidence shows the existence of an underlying impairment that

could be reasonably expected to produce the claimant's symptoms, the ALJ must evaluate "the intensity, persistence, and functionally limiting effects of the symptoms . . . to determine the extent to which the symptoms affect the individual's ability to do basic work activities." SSR 96-7p; *see also* 20 C.F.R. § 404.1529(c); *Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994); *Williams*, 915 F. Supp. at 964. "This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects." SSR 96-7p. In making this finding, the ALJ must consider various factors in addition to the objective medical evidence, including the claimant's daily living activities; the location, duration, frequency, and intensity of his pain; factors that precipitate or aggravate the symptoms; the type, dosage, effectiveness and side effects of any pain medication; treatment, other than medication, that the claimant receives for pain; any other measures that he uses to relieve pain; and any other factors concerning the claimant's functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c); SSR 96-7p.

Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *see Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning

12

rather than merely the demeanor of the witness . . . .").

Here, the ALJ concluded at step one of his credibility analysis that Hodges had an underlying medically determinable physical impairment, that is, his lumbar degenerative disk disease, that could reasonably be expected to produce his pain or other symptoms. (Tr. 308.) At step two, however, the ALJ determined that Hodges's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they [were] inconsistent with the [RFC] assessment . . . ." (Tr. 308.) It is at this second step where Hodges focuses his challenge to the ALJ's reasoning, contending that the ALJ failed to "properly analy[ze]" the factors set forth in SSR 96-7p and 20 C.F.R. § 404.1529(c) and explain his rationale. (Opening Br. 12.)

More particularly, Hodges contends that the ALJ "discussed virtually nothing about [Hodges's] daily activities or . . . pain medication", two of the factors set forth in 20 C.F.R. § 404.1529(c). (Opening Br. 13.) His assertion, however, is without merit, as the ALJ did indeed discuss both of these factors. *See* 20 C.F.R. § 404.1529(c)(3)(i), (iv); SSR 96-7p. As to his daily activities, the ALJ acknowledged that Hodges stated at the hearing that his landlady did all of the housework, prepared his meals, and took him to the doctor. (Tr. 308.) The ALJ also noted that, in contrast, Hodges told Dr. Kancherla in 2003 that he lived alone, was able to perform his daily activities and household chores independently, and could drive a car. (Tr. 300.) Therefore, the ALJ discussed Hodges's daily activities, at least minimally, highlighting the inconsistency of the record pertaining to his performance of daily activities. *See generally Kornfield v. Apfel*, No. 00 C 5642, 2003 WL 103009, at *4 (N.D. Ill. Jan. 9, 2003) (discounting a claimant's credibility due to her inconsistent statements).

13

Nevertheless, Hodges argues that the ALJ erred by failing to discuss his testimony that he needed help with showering and tying his shoes. The ALJ, however, "need not provide a written evaluation of every piece of evidence that is presented." *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citation omitted). Rather, the ALJ must only "minimally articulate his . . . justification for rejecting or accepting specific evidence of disability." *Id*. (citation omitted); *see also Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999) (emphasizing that an ALJ need not evaluate every piece of evidence in writing, but must sufficiently articulate the ALJ's assessment of the evidence to assure that the important evidence has been considered and that the ALJ's path of reasoning can be traced); *Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (same). Here, the ALJ acknowledged the key evidence concerning Hodges's daily activities—his testimony at the hearing that he received assistance from his landlady for some personal care tasks and all household tasks, and his contrasting statement to Dr. Kancherla that he was independent in driving his car and in performing his daily household chores. *See generally Stephens v. Heckler*, 766 F.2d 284, 287-88 (7th Cir. 1985) ("If a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the ALJ has done enough."). Therefore, the ALJ did indeed adequately consider the contrasting evidence concerning Hodges's performance of activities of daily living.

And, contrary to Hodges's assertion, the ALJ also sufficiently discussed the evidence concerning Hodges's use of pain medication. He noted that in 2000, Hodges underwent several series of back injections for pain that gave him "minimal relief" and that he also took Vicodin and Altrum, "which made his pain tolerable". (Tr. 308.) The ALJ further acknowledged Hodges's testimony that even when he takes his pain medications, his pain is a "six" or "seven"

14

on a ten-point scale. (Tr. 308.) He also noted that Hodges experiences some side effects from the medication and that Dr. Johnson, Hodges's family physician who managed Hodges's pain medication refills, never referred him to a pain specialist. (Tr. 309.) Therefore, Hodges's bald contention that the ALJ "discussed virtually nothing" about Hodges's pain medication is not supported by the record, as the ALJ also adequately considered this factor. *See* 20 C.F.R. § 404.1529(c)(3)(iv); SSR 96-7p.

Furthermore, in addition to considering Hodges's daily living activities and his use of pain medication, Hodges ignores the fact that the ALJ *also* properly considered other factors prescribed by 20 C.F.R. § 404.1529(c) and SSR 96-7p. That is, the ALJ specifically described the location, duration, and intensity of Hodges's pain, explaining that it "ran from his back down the left leg to his big toe"; that it was "constant, sharp, stabbing, shooting, and unbearable at times"; and measured "six" to "seven" on a ten-point scale. (Tr. 308); *see* 20 C.F.R. § 404.1529(c)(ii); SSR 96-7p. The ALJ also properly considered that, in addition to taking pain medication and receiving injections, Hodges underwent other treatment to relieve his pain, including surgery and physical therapy. (Tr. 308); 20 C.F.R. § 404.1529(c)(v); SSR 96-7p.

Moreover, and perhaps most significantly, the ALJ properly relied upon another factor in accordance with 20 C.F.R. § 404.1529(c)(3)(vii) and SSR 96-7p when deciding to discount Hodges's subjective symptoms—the FCE he underwent in 2001 at the direction of Dr. Boylan. (Tr. 308.) The ALJ observed that the results of the FCE, which were considered valid, indicated that Hodges could perform light work; specifically, he could lift twenty pounds occasionally and ten pounds frequently, perform sitting and standing duties frequently, and kneel and squat occasionally. (Tr. 309.) The ALJ then noted that Dr. Boylan adopted these limitations as

15

Hodges's permanent work restrictions and that they were also consistent with Dr. Boylan's objective findings and Dr. Kancherla's evaluation results. (Tr. 309.) Therefore, ample evidence supports the ALJ's conclusion to discount Hodges's subjective complaints of pain to the extent that they were inconsistent with the assigned RFC.

In sum, the ALJ adequately built an accurate and logical bridge between the evidence of record and his conclusion that Hodges's testimony of debilitating limitations was not entirely credible, and his determination is not "patently wrong." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *Powers*, 207 F.3d at 435. Therefore, the ALJ's credibility determination, which is entitled to special deference, *Powers*, 207 F.3d at 435, will not be disturbed.

### D. The ALJ Sufficiently Considered the Diagnosis of "Chronic Pain Syndrome" Assigned by Dr. Johnson

Hodges also complains that the ALJ failed to adequately consider the diagnosis of "chronic pain syndrome" ("CPS") assigned to him by Dr. Johnson, his family practitioner. Specifically, Hodges argues that because the ALJ "did not address [Hodges's] CPS in any way whatsoever, it is unclear whether or not ALJ McGrath considered [Hodges's] CPS at Step 2 . . . or alone and in combination with his other impairments at Steps 3 . . . 4 and 5." (Opening Br. 17.) Hodges's final argument, however, is a non-starter.

Contrary to Hodges's characterization of the record, the ALJ did indeed consider Dr. Johnson's diagnosis of chronic pain syndrome. After penning no less than three paragraphs about Dr. Johnson's care of Hodges from 2000 to 2004, the ALJ specifically stated: "Dr. Johnson consistently diagnosed the claimant with chronic pain syndrome." (Tr. 309.) Therefore, once again, Hodges's bald assertion is not supported by the record. And, in any event, Hodges's argument misses the mark, as the relevant inquiry is whether his pain was of a disabling severity

16

during the relevant period, not the diagnosis that he was assigned. *See, e.g.*, *Betancourt v. Apfel*, 23 F. Supp. 2d 875, 879, 882 (N.D. Ill. 1998) (determining that claimant was not disabled because her symptoms were not of disabling severity prior to her date last insured, though she was diagnosed with a progressive disease during the relevant period).

Furthermore, the ALJ thoroughly explained his rationale for discounting Dr. Johnson's opinions of Hodges's limitations. He observed that Dr. Johnson's opinions about Hodges's limitations were "virtually without clinical data" to support them (Tr. 309), and thus were not entitled to controlling weight. *See Clifford*, 227 F.3d at 870 ("[A] treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record."); *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002). The ALJ then weighed Dr. Johnson's opinion in accordance with the factors set forth in 20 C.F.R. § 404.1527(d),[6] ultimately determining that the opinion deserved "[l]ittle weight." (Tr. 309). In making this determination, the ALJ considered that Dr. Johnson was a family practitioner, not a specialist, and that his opinions generally lacked objective or clinical findings. *See* 20 C.F.R. § 404.1527(d)(3), (5).

After discounting Dr. Johnson's opinion, the ALJ instead chose to assign more weight to the opinion of Dr. Boylan. In doing so, the ALJ acknowledged that Dr. Boylan was a specialist in orthopaedics and that his opinion of Hodges's limitations was supported by his objective

---

[6] The relevant factors include: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

17

findings, the FCE results, and Dr. Kancherla's consulting opinion. *See* 20 C.F.R. § 404.1527(d)(3), (5); *see generally Stephens*, 766 F.2d at 288 ("The patient's regular physician may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.").

As a result, the ALJ's consideration of Dr. Johnson's opinion is supported by substantial evidence and does not serve as a basis for a remand of the ALJ's decision. Therefore, the Commissioner's final decision will be affirmed.

## VI. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Hodges.

SO ORDERED.

Enter for this 14th day of September, 2010.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge
